BILAL A. ESSAYLI
United States Attorney
LINDSEY GREER DOTSON
Assistant United States Attorney
Chief, Criminal Division
KEVIN J. BUTLER (Cal. Bar No. 329129)
JENA A. MACCABE (Cal. Bar No. 316637)
Assistant United States Attorneys
Violent and Organized Crime Section
     1300 United States Courthouse
     312 North Spring Street
     Los Angeles, California 90012
     Telephone: (213) 894-6495/5046
     Facsimile: (213) 894-0141
     E-mail:   kevin.butler2@usdoj.gov
             jena.maccabe@usdoj.gov

Attorneys for Plaintiff
UNITED STATES OF AMERICA

UNITED STATES DISTRICT COURT

FOR THE CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>       Plaintiff,<br><br>          v.<br><br>EUGENE HENLEY, JR.,<br>  aka "Big U,"<br>  aka "Unc,"<br>  aka "Draws,"<br>  aka "Hannibal,"<br>  aka "Hannibal Muhammad,"<br>  aka "Anybody Killa,"<br>  aka "Dave Austin,"<br><br>       Defendant. | No. CR 25-00211-FLA-1<br><br>BRIEF IN SUPPORT OF DETENTION FOR DEFENDANT EUGENE HENLEY, JR.<br><br>Hearing Date: April 22, 2025<br>Hearing Time: 9:30 a.m.<br>Location:   Courtroom of the<br>            Hon. A. Joel<br>            Richlin |

     Plaintiff United States of America, by and through its counsel of record, the United States Attorney for the Central District of California and Assistant United States Attorneys Kevin J. Butler and Jena A. MacCabe, hereby files its brief in support of detention for defendant Eugene Henley, Jr., also known as ("aka") "Big U," aka

"Unc," aka "Draws," aka "Hannibal," aka "Hannibal Muhammad," aka "Anybody Killa," aka "Dave Austin."

This brief is based upon the attached memorandum of points and authorities, the files and records in this case, and such further evidence and argument as the Court may permit.

Dated: April 21, 2025          Respectfully submitted,

                               BILAL A. ESSAYLI
                               United States Attorney

                               LINDSEY GREER DOTSON
                               Assistant United States Attorney
                               Chief, Criminal Division


                                    /s/
                               _____
                               KEVIN J. BUTLER
                               JENA A. MACCABE
                               Assistant United States Attorneys

                               Attorneys for Plaintiff
                               UNITED STATES OF AMERICA

ii

**TABLE OF CONTENTS**

DESCRIPTION                                                                      PAGE

MEMORANDUM OF POINTS AND AUTHORITIES.................................1

I.      INTRODUCTION..................................................1

II.     STATEMENT OF FACTS............................................3

        A.    Defendant Is a Dedicated Rollin' 60 and Leader of His
              Own Violent Racketeering Enterprise.....................3

        B.    Recent Examples of Defendant's Acts or Threats of
              Violence................................................4

              1.    Murder of R.W.....................................4

              2.    Robbery and Extortion.............................4

              3.    Power to Direct Violence..........................6

        C.    Despite a Prior 23-Year Sentence for Armed Robbery,
              Defendant Stayed Armed..................................6

        D.    Defendant Is Not Only a Physical Danger but a
              Financial Danger Too....................................7

        E.    Defendant Is Fluent in Obstruction......................8

III.    LEGAL STANDARD................................................9

IV.     DEFENDANT SHOULD REMAIN DETAINED BECAUSE HE IS A RISK OF
        NON-APPEARANCE AND A DANGER TO THE COMMUNITY.................10

        A.    Nature and Circumstances of the Offenses...............10

        B.    Weight of the Evidence.................................13

        C.    History and Characteristics of Defendant...............14

        D.    Nature and Seriousness of the Danger Posed by
              Defendant's Release....................................17

V.      CONCLUSION...................................................21

1

**TABLE OF AUTHORITIES**

2

<u>DESCRIPTION</u>                                                                    <u>PAGE</u>

3

**Cases**

4

<u>United States v. Aslanian</u>,
   2022 WL 18046468 (9th Cir. Dec. 30, 2022) ....................... 13

5

<u>United States v. Barone</u>,
   387 F. App'x 88 (2d Cir. 2010) ................................. 14

6

7

<u>United States v. Brennerman</u>,
   705 F. App'x 13 (2d Cir. 2017) ................................. 12

8

<u>United States v. Calabrese</u>,
   436 F. Supp. 2d 925 (N.D. Ill. 2006) ........................... 13

9

10

<u>United States v. Cazares</u>,
   445 F. Supp. 3d 425 (N.D. Cal. 2020) ........................... 11

11

<u>United States v. Ciccone</u>,
   312 F.3d 535 (2d Cir. 2002) .................................... 11

12

13

<u>United States v. Colombo</u>,
   777 F.2d 96 (2d Cir. 1985) ..................................... 11

14

<u>United States v. Comberger</u>,
   2021 WL 1725516 (E.D. Ky. Apr. 30, 2021) ....................... 18

15

16

<u>United States v. Diaz-Hernandez</u>,
   943 F.3d 1196 (9th Cir. 2019) ............................ 9, 10, 15

17

<u>United States v. English</u>,
   629 F.3d 311 (2d Cir. 2011) .................................... 13

18

19

<u>United States v. Ermin</u>,
   710 F. Supp. 3d 163 (W.D.N.Y. 2024) ............................ 14

20

<u>United States v. Ferranti</u>,
   66 F.3d 540 (2d Cir. 1995) ................................. 19, 20

21

22

<u>United States v. Gonzalez Claudio</u>,
   806 F.2d 334 (2d Cir. 1986) .................................... 12

23

<u>United States v. Hernandez</u>,
   2020 WL 4287585 (C.D. Cal. July 24, 2020) ...................... 15

24

25

<u>United States v. Hernandez-Miranda</u>,
   601 F.2d 1104 (9th Cir. 1979) .................................. 16

26

<u>United States v. Hir</u>,
   517 F.3d 1081 (9th Cir. 2008) .............................. 18, 19

27

28

United States v. Honeyman,
   470 F.2d 473 (9th Cir. 1972) ................................... 13

United States v. LaFontaine,
   210 F.3d 125 (2d Cir. 2000) ................................... 18

United States v. Lomax,
   493 F. App'x 437 (4th Cir. 2012) ............................. 15

United States v. Malicek,
   2008 WL 4962850 (C.D. Cal. Nov. 19, 2008) ................... 15

United States v. Moscaritolo,
   2010 WL 309679 (D.N.H. Jan. 26, 2010) ....................... 12

United States v. Motamedi,
   767 F.2d 1403 (9th Cir. 1985) ................................. 9

United States v. Murrington,
   2013 WL 2443260 (N.D. Cal. June 4, 2013) .................... 15

United States v. Orena,
   986 F.2d 628 (2d Cir. 1993) ................................... 11

United States v. Prieto,
   2020 WL 3105414 (W.D. Ky. June 11, 2020) .................... 18

United States v. Richardson,
   2011 WL 5026456 (S.D. Ohio Oct. 21, 2011) .................. 18

United States v. Tortora,
   922 F.2d 880 (1st Cir. 1990) .............................. 10, 19

United States v. Townsend,
   897 F.2d 989 (9th Cir. 1990) ................................. 12

United States v. Winsor,
   785 F.2d 755 (9th Cir. 1986) ................................. 10

United States v. Zhang,
   55 F.4th 141 (2d Cir. 2022) ................................... 13

**Statutes**

18 U.S.C. § 3142............................................. 9, 13

1

## MEMORANDUM OF POINTS AND AUTHORITIES

2

## I.    INTRODUCTION

3        For decades, defendant Eugene Henley, Jr., also known as "Big

4    U," ("defendant") has put on a public façade, masquerading as a

5    reformed gang member and legitimate businessman whose only ambition

6    was to better his community.  But defendant wasn't helping Crenshaw.

7    He was helping himself.  In the shadows, defendant was secretly

8    operating as kingpin of a criminal enterprise that has ruled Los

9    Angeles through violence, fear, and intimidation.  Now, he seeks

10   pretrial release under the guise of his "reformed" persona even

11   though his criminal activities have included murder, extortion,

12   robbery, wire fraud, bank fraud, and human trafficking.   The Court

13   should see through defendant's farce and keep him in custody for the

14   safety of the community.

15       To avoid custody, defendant will no doubt continue his double

16   dealing, as he did to celebrities and donors that he duped into

17   believing they were helping young, underprivileged athletes chase

18   their dreams, when in reality they were unwittingly lining

19   defendant's pockets as he embezzled donation after donation.  Even in

20   his short time in custody, he is up to his old tricks, once again

21   trying to use some of those same celebrities for his personal gain.

22   He has even suggested that he can manipulate the President of the

23   United States into intervening in the case and dropping the charges,

24   even as he simultaneously derisively refers to the President as "the

25   orange man" while in custody.  This Court should not be fooled by the

26   good deeds defendant promises to accomplish if only he could close

27   the detention doors behind him.  The truth is that he will

28

1

1  undoubtedly cause exponential harm to the case, to the community, and

2  to others if he were released.

3      Defendant should remain detained for the safety of the

4  community, the victims and witnesses in this case (in defendant's own

5  words, "If I would've had a problem with any man . . . , the issue

6  would've been resolved, and he wouldn't be here, or I wouldn't be

7  here."), and for the hope of some semblance of justice for the

8  families of his victims.  Indeed, with seemingly just hours of notice

9  of his impending arrest, defendant has already destroyed valuable

10 evidence, attempted to paint a false narrative of his criminality in

11 the public, and publicly condemned his enemies by name.  He cannot be

12 allowed to continue on his obstructive path.

13      Any supporters defendant may offer as sureties will not protect

14 the community.  They did not save R.W., whom defendant murdered and

15 abandoned in the desert.  They did not save defendant's countless

16 extortion and embezzlement victims whom defendant terrorized or

17 tricked for years.  They did not stop defendant from leaving Los

18 Angeles in the midnight hours before his arrest or hurling thinly

19 veiled threats in the leadup to his surrender.  This Court should

20 have no trouble finding that defendant represents a danger (and risk

21 of non-appearance/non-compliance with Court orders) that cannot be

22 adequately mitigated through release conditions.  With the utmost

23 respect to Pretrial Services, pretrial supervision is not enough.

24 For the sake of the community, defendant should remain in custody.

25

26

27

28

## II.   STATEMENT OF FACTS

### A.   Defendant Is a Dedicated Rollin' 60 and Leader of His Own Violent Racketeering Enterprise

Defendant is an avowed and famed member of the Rollin' 60s Neighborhood Crips street gang.  As early as 1992, the Los Angeles Times described defendant as the leader of that gang, and little has changed as defendant as aged.  As he states in many interviews, when asked about any gang tattoos "It ain't on you; it's in you."  Indeed, defendant's gang ties run deep in his blood.  Defendant has loudly recounted the terror he instilled for years.  In various interviews, defendant recounts selling narcotics, taking a percentage of all illegal activity in the neighborhood, leading the "body snatchers" kidnapping crew, and eventually going to prison where he immediately claims to have paid off the guards and taken a percentage of drug sales.

Now, after an investigation spanning more than four years, defendant was charged with running the Big U Enterprise, from at least 2010 until his arrest, which often used the Rollin' 60s as muscle in its criminal activities.  Specifically, defendant, often assisted by Rollin' 60s or other members and associates of the Big U Enterprise, used intimidation, fear, violence, threats of violence, assaults, extortion, and murder in the streets for power and profit.  Through the media and his nonprofit "Developing Options," defendant portrayed himself as the neighborhood's savior in drawing in donations and government resources intended to benefit at-risk youth, but which he oftentimes used to fund his lifestyle instead.  Despite his life of crime, defendant never wanted to return to jail, so he

went to great lengths to avoid law enforcement detection, tamper with witnesses, and otherwise obstruct justice.

**B.    Recent Examples of Defendant's Acts or Threats of Violence**

1.    Murder of R.W.

In 2021, defendant drove to Las Vegas with another enterprise member to confront R.W. -- a rapper signed to defendant's record label, who was also a close friend of defendant's son and someone defendant had known for years.  Apparently upset about R.W.'s lack of studio production and purported diss song, defendant left the studio with R.W. in the middle of the night for R.W.'s Airbnb.  R.W. leaving his Airbnb with his belongings was the last time he was seen alive, as he was found the next morning with gunshot wounds to the head. Defendant returned to the studio hours after he had left, claiming he had gone to the gym despite the 2 a.m. hour.  Defendant's cellphone activity, the obstructionist conduct of other members of the enterprise, and defendant's own words and reactions intercepted on the wire prove his guilt of the heinous crime.  R.W.'s murder not only demands defendant's continued detention, but cautions against what may happen to other witnesses, cooperators, and victims were defendant to be released on bond.

2.    Robbery and Extortion

Throughout the period of interception, and before, defendant was captured on audio and video recordings extorting Victim-1 -- both through a co-defendant, Sylvester Robinson ("Robinson"), and personally.  In doing so, defendant and Robinson frequently threatened violence against Victim-1 if he failed to pay their fees. Those threats were not empty; when Victim-1 started to ignore defendant's calls demanding extortion payments, defendant sent

4

multiple armed robbers to Victim-1's dispensary to rob him and then demanded $10,000 from Victim-1 to prevent future robberies.  In multiple intercepted calls, defendant and his co-conspirators discussed even more robberies they were committing.  Robinson also frequently told Victim-1 about defendant's violence, including that defendant was the only "OG" still actively committing murders.

In addition to the constant extortion of Victim-1, defendant extorted Victim-2 for $30,000 for a party thrown in defendant's honor in December 2021.  When the victims requested to pay only $20,000, defendant responded with force, threatening, "I'll tear that bitch up!  It won't be a club there no more!" and then sending Robinson, another co-defendant, Mark Martin ("Martin"), and members of the Rollin' 60s to confront Victim-2 at his business and extort $30,000 from him.

While the substantive extortion counts are currently limited to just some of those extortions of Victim-1 and Victim-2, they are not defendant's only extortions.  For example, on October 19, 2021, defendant told Victim-1 that defendant was taking over the extortion of another businessowner.  Then, on November 7, 2022, on an intercepted call, after yet another extortion victim stated that defendant had not fully paid the extortion victim for work on defendant's vehicle, defendant directed Martin to call the extortion victim "right now" and stated that he would "go out there n' kill that nigga."  On February 14, 2023, on another intercepted call, Robinson told defendant that Robinson told "Jew Boy" that he owed the Big U Enterprise money, that they would allow a payment plan, but if he did not pay, they were going to "shut this motherfucker down."

### 3.   Power to Direct Violence

Making him that much more dangerous, defendant holds power over others threatening and committing violence.  For example, on November 23, 2022, on an intercepted call, defendant said that he can pay three people $50 each to beat someone up and described paying people to "mess up" a store that was refusing to provide defendant a discount.  On April 17, 2023, on another intercepted call, defendant directed an individual to deliver a message to another marijuana dispensary owner that defendant said, "fuck him . . . [and] that he fucked with the wrong guy."

**C.   Despite a Prior 23-Year Sentence for Armed Robbery, Defendant Stayed Armed**

Since at least July 20, 1992, defendant has been prohibited from even possessing firearms based on his felony convictions for second degree robbery with a firearm, conspiracy, and drug trafficking, for which he received a 23-year prison sentence.  Upon his release from prison, he nevertheless continued to use firearms himself, like when he murdered R.W., and directed others to use firearms, like when they robbed Victim-1's dispensary.  Throughout this investigation, recordings corroborated that defendant consistently was armed.

On October 22, 2022, Robinson told Victim-1 that defendant and Robinson would be attending an after-party at a club that Victim-1 was promoting and that a "pat down is out" because defendant would be in attendance, implying that defendant was armed.  On an intercepted call a month later, defendant told an incarcerated individual that anyone coming at him "better come correct" because defendant always has "two blowers" (i.e., firearms) on him.  On January 3, 2023, on an intercepted call, defendant described to an incarcerated individual

"tooling up" with firearms to travel to a Crips neighborhood because "we are the most arrogant, bougie, self-righteous motherfuckers on planet Earth."  On April 1, 2023, on another intercepted call, defendant asked someone to grab defendant's "blower," which he left on the ground, in a blue sweatshirt, in front of a tire.

### D. Defendant Is Not Only a Physical Danger but a Financial Danger Too

Defendant's crimes against victims are not confined only to violence.  He spent decades creating a façade of a reformed gang member who seeks to build, rather than destroy, his community.  So disguised, defendant used that persona primarily to take from the very community he claims to help.  Hundreds of thousands of dollars flowed from charitable donors and government programs to defendant's Developing Options bank account.  Almost immediately, he siphoned off much of the money into his personal bank account.  Defendant got richer and richer off his fraud, like his extortions and robberies, owning multiple homes, driving a Mercedes, taking lavish trips, and shopping for luxuries like a $30,000 necklace.  The money taken from donors and taxpayers' pockets will never find their intended benefactors -- the at-risk youth and children of Crenshaw.  That damage cannot be undone.  But defendant's success in deceiving politicians, celebrities, and community activists, as well as the public at large, further militates against his release back into that community as he attempts to fund an expensive defense.[1]

_____

[1] Indeed, the FBI has received information that defendant is demanding $100,000 to $200,000 from celebrities to fund his legal defense.  In case that does not work, he also concocted an elaborate plan over jail calls to use politically connected associates -- including identified victims in this case whom he has already

*(footnote cont'd on next page)*

7

1    **E.    Defendant Is Fluent in Obstruction**

2    All of it may be founded on crimes, but defendant built a

3    charmed life following his 23-year sentence for armed robbery.  He

4    does not want to give it up and uses obstruction frequently to avoid

5    that.  The destruction of surveillance footage, use of encrypted

6    applications like FaceTime, demands to meet in person to avoid law

7    enforcement intercepting communications, use of multiple phones and

8    cars, orders not to speak to law enforcement, and chastising of any

9    perceived or suspected cooperators are detailed in the charging

10   instruments.  A few are also highlighted here.

11   Even when the criminal charges were not against defendant

12   personally, defendant instructed a victim's relative that the victim

13   was to "go to the lineup.  Tell him to pick the wrong person," to

14   insulate defendant's associate from the charges.  A master

15   manipulator, defendant told another associate that to influence the

16   media for his lawsuit against law enforcement, he should show both

17   positive and negative parts of his life, wear glasses, and say that

18   he was working with Developing Options, even though he was not.

19   On multiple intercepted calls, defendant talked about beating up

20   or "at least" breaking a witness's jaw, and while defendant may claim

21   other reasons for feuding with that witness, this Court should

22   protect him.  After fleeing with his phones in the hours before his

23   scheduled arrest in this case, in an attempt to intimidate and

24   dissuade anyone from cooperating with law enforcement or otherwise

25   reporting information about defendant, defendant posted publicly on

26   Instagram, naming his co-defendants and known opponents, instructing

27

28   defrauded -- to advocate for the President's (whom he disrespectfully
     calls "the orange man" behind his back) intervention in his case.

the public not to associate with them, and claiming that if they did, "they were not black."  In an attempt to poison the jury pool, defendant posted on Instagram, claiming racial profiling (ignoring that almost every single one of defendant's victims -- from R.W. to many of his extortion/robbery/fraud victims and the at-risk youth he was supposed to help -- are black) and blaming his co-defendants and opponents for the charges filed against him in a federal criminal complaint.

**III. LEGAL STANDARD**

A defendant must be detained pending trial where "no condition or combination of conditions will reasonably assure the appearance of the person as required and the safety of any other person and the community."  18 U.S.C. § 3142(e)(1).  Detention is thus appropriate for a defendant who is either a danger to the community or a risk of non-appearance.  <u>United States v. Motamedi</u>, 767 F.2d 1403, 1406 (9th Cir. 1985).

"[T]he Bail Reform Act mandates an individualized evaluation guided by the factors articulated in § 3142(g)."  <u>United States v. Diaz-Hernandez</u>, 943 F.3d 1196, 1199 (9th Cir. 2019).  Those factors are:

> (1)  the nature and seriousness of the offense charged, including whether the offense is a crime of violence;
>
> (2)  the weight of the evidence against the defendant;
>
> (3)  the defendant's character, physical and mental condition, family and community ties, past conduct, history relating to drug or alcohol abuse, and criminal history; and
>
> (4)  the nature and seriousness of the danger to any person or to the community that would be posed by the defendant's release.

9

1  United States v. Winsor, 785 F.2d 755, 757 (9th Cir. 1986) (per

2  curiam).  Consideration of non-statutory factors is disfavored.

3  Diaz-Hernandez, 943 F.3d at 1199.

4  **IV.  DEFENDANT SHOULD REMAIN DETAINED BECAUSE HE IS A RISK OF NON-**
5  **     APPEARANCE AND A DANGER TO THE COMMUNITY**

6      The 43 federal charges against defendant, the damning evidence

7  against him, his dangerous history and characteristics, and the risk

8  to numerous specific individuals and the community at large if he

9  were to be released all support his detention pending trial.

10      **A.   Nature and Circumstances of the Offenses**

11      The nature and circumstances of defendant's offenses

12  unequivocally weigh in favor of detention.  There is no crime more

13  serious or permanent than the murder that defendant committed, and

14  still, defendant did not stop there.

15      Courts considering cases like defendant's have unanimously ruled

16  in favor of detention.  See, e.g., United States v. Tortora, 922 F.

17  880, 885 & n.6 (1st Cir. 1990) (detaining on danger, reversing

18  district court's release order, noting defendant's "total commitment

19  to a life of crime," quoting defendant's threats to kill, and finding

20  his association with organized crime and "devotion to the Mafia" a

21  "highly relevant" consideration to detention).  The Tortora court

22  detained the defendant, who "made the Mafia his highest priority in

23  life and pledged fealty to its needs, whatever the circumstances."

24  Id. at 885.  Defendant here, like in Tortora, "is virtually a

25  paradigm of the criminal who, within the contemplation of the Bail

26  Reform Act, might plausibly be subjected to pretrial detention on

27  grounds of dangerousness."  Id. at 886.  Similarly, where a

28  magistrate judge released a defendant charged with RICO crimes

including conspiracy to commit attempted murder and conspiracy to commit assault, with the background of an enterprise engaged in other acts of violence, the district court reversed, noting that the defendant "is charged with violent and serious crimes" and allegedly "has been a member of [his] street gang since May 2012," and that the "seriousness and violent nature of the crimes [the defendant] is charged with weighs against his release." United States v. Cazares, 445 F. Supp. 3d 425, 431 (N.D. Cal. 2020).

Where a defendant was charged in a RICO indictment based on extortion, wire fraud, witness tampering, and other crimes, and he "directed the activities of his codefendants," as defendant did here, detention was warranted "based on his activities as well as the activities of those he supervised and controlled." United States v. Ciccone, 312 F.3d 535, 538, 543 (2d Cir. 2002) (also citing multiple Second Circuit cases that have "rejected as insufficient various conditions of release proposed in cases involving the pretrial detention of purported leaders of organized crime families shown to be involved in violent criminal activities"); see also United States v. Colombo, 777 F.2d 96, 99 (2d Cir. 1985) (reversing release order even where defendant did not directly participate in any crime alleged but led the criminal enterprise that carried out criminal activities at his direction). Defendants facing RICO charges based on predicate acts of murder, conspiracy to murder, and other crimes were also detained on danger, for "readily further[ing]" organized crime's "criminal objectives through violence," which appropriately describes defendant here. United States v. Orena, 986 F.2d 628, 632 (2d Cir. 1993).

Moreover, as currently charged, defendant faces a statutory maximum of well over 600 years.  Even discounting defendant's criminal history due to its age, as currently charged, defendant faces a likely Guidelines range of life in prison based on a total offense level of 43 for Count One alone.  See U.S.S.G. §§ 2E1.1(a)(2), 2A1.1(a).

The severity of the potential penalties involved augments defendant's risk of non-appearance.  See United States v. Brennerman, 705 F. App'x 13, 15-16 (2d Cir. 2017) (affirming denial of bail based on risk of non-appearance where defendant facing fraud charges that exposed him to a range of just 57 to 71 months' imprisonment); United States v. Townsend, 897 F.2d 989, 994-95 (9th Cir. 1990) (explaining that "[f]acing the much graver penalties possible under the present indictment, the defendants have an even greater incentive to consider flight" and noting that electronic monitoring cannot assure prevention of non-appearance); see also United States v. Gonzalez Claudio, 806 F.2d 334, 338 (2d Cir. 1986) ("It is entirely reasonable to conclude that a risk of flight is more likely in circumstances where evidence indicates that a defendant has engaged in terrorist activities and faces a substantial risk of being convicted of serious pending charges and receiving significant punishment.").  While defendant turned himself in after a period of flight and removal of evidence, he did not -- at that time -- know the weight of the charges, the substantial sentence he faces, or the insurmountable weight of the evidence proving his crimes.  See United States v. Moscaritolo, No. 10-cr-004-01-JL, 2010 WL 309679, at *2 (D.N.H. Jan. 26, 2010) ("[T]he steeper the potential sentence, the more probable

1  the flight risk is, especially considering the strong case of the

2  government . . . ." (quotation omitted)).

3      In sum, the nature and circumstances of defendant's offenses

4  demonstrate that he is a risk of both danger and non-appearance.

5  **B.  Weight of the Evidence**

6      The evidence that defendant committed the charged offenses is

7  overwhelming and cannot be ignored in assessing defendant's risk of

8  danger and non-appearance in this case.[2]  See, e.g., United States v.

9  Aslanian, No. 22-50300, 2022 WL 18046468, at *1 (9th Cir. Dec. 30,

10  2022) ("Given the nature of the crime and the **strength of the**

11  **government's case**, we find that the government has met its burden of

12  showing, by clear and convincing evidence, that 'no condition or

13  combination of conditions will reasonably assure . . . the safety of

14  . . . the community.'" (emphasis added)).

15

16      [2] Nothing in the text endorses assigning relative weights to the
statutory factors, 18 U.S.C. § 3142(g), and this Court should decline

17  to do so.  The statement that the strength of the evidence is
deserving of the "least weight" originated with United States v.

18  Honeyman, 470 F.2d 473, 474 (9th Cir. 1972), but only in the context
of applying the factors to that specific case (forgery).  While one

19  factor might outweigh others in a particular case, it is
inappropriate to treat one factor as categorically less important.

20  See United States v. Zhang, 55 F.4th 141, 149 (2d Cir. 2022) ("[T]he
weight given to each factor will inevitably vary from case to

21  case.").  Indeed, various courts have questions and criticized the
creation of a hierarchy of factors.  See, e.g., United States v.

22  Calabrese, 436 F. Supp. 2d 925, 927 (N.D. Ill. 2006) (finding that
"[s]ubsequent Ninth Circuit opinions seized on [one case's] language

23  but without discussing the justification for favoring one," "[t]he
statute does not instruct that one or another factor is less

24  important," "it is difficult to see how this factor could always be
less important than others," "were there very strong evidence that a

25  defendant was a serial rapist or killer, this factor alone might
outweigh all other[s]," and that the principle is an "off-key but

26  well-intentioned attempt to remind us of the rule that detention is
not to ordered simply because we are convinced that the accused is

27  guilty.").  To the contrary, other Circuits have described it as "one
of the most important factors."  United States v. English, 629 F.3d

28  311, 317 (2d Cir. 2011).

1    Defendant was captured of audio recordings and intercepted wire
2    calls discussing various violent and other crimes, for months and
3    even years.  Many of his extortions were themselves captured in
4    recordings.  The financial records and tax documents do not lie
5    either; they show exactly how defendant committed all his fraud, and
6    the recordings show why.  All the evidence in this case conclusively
7    shows defendant's personal involvement in murder, extortion, robbery,
8    fraud, human trafficking, and tax crimes.  Defendant's entire purpose
9    was based on financial gain, respect, fear, and intimidation.
10    Accordingly, the weight of the evidence favors defendant's continued
11    detention.

12        **C.    History and Characteristics of Defendant**
13        This Court should not fall victim to any argument about
14    defendant's lack of convictions since his release from state custody
15    in the early 2000s; absence of convictions is not the same as absence
16    of crimes.  Defendant's history and characteristics plainly favor
17    detention.  Cf. United States v. Ermin, 710 F. Supp. 3d 163, 181
18    (W.D.N.Y. 2024) (detaining defendant, who had no criminal history and
19    was only charged with possessing firearms while being a recreational
20    user of marijuana, because of his role as president of a motorcycle
21    club rewarding "violence and stymying law enforcement efforts"),
22    aff'd, No. 24-138, 2024 WL 1652240 (2d Cir. Feb. 21, 2024).

23        Defendant's involvement in multiple violent offenses, while
24    holding himself out to be a gang interventionist working with law
25    enforcement, renders him particularly dangerous to the community.
26    See United States v. Barone, 387 F. App'x 88, 90 (2d Cir. 2010) ("The
27    fact that Barone committed and planned violent crimes even when
28    purportedly cooperating with authorities signals a degree of

14

1    dangerousness unlikely to be deterred by bail release conditions.");

2    see also United States v. Lomax, 493 F. App'x 437, 439 (4th Cir.

3    2012) (per curiam) (affirming district court's explanation that

4    defendant's Hobbs Act robbery "crimes were a danger to the community"

5    in affirming sentence).  His violent grip over Los Angeles is

6    exacerbated by his apparent continued access to firearms (despite

7    being a felon) repeatedly discussed on intercepted calls.  See, e.g.,

8    United States v. Malicek, No. SA CR 08-275 AHS, 2008 WL 4962850, at

9    *2 (C.D. Cal. Nov. 19, 2008) (ordering detention because, among other

10   reasons, "evidence of substance abuse and a firearm registered in

11   defendant's name also shows that defendant poses a danger to the

12   community"); United States v. Hernandez, No. 2:19-CR-00737-ODW, 2020

13   WL 4287585, at *3 (C.D. Cal. July 24, 2020) (ordering detention where

14   defendant's possession of a loaded firearm and drugs "represented a

15   danger to the community"); United States v. Murrington, No. CR 13-

16   70444-MAG KAW, 2013 WL 2443260, at *2 (N.D. Cal. June 4, 2013)

17   (ordering detention where defendant fought and ran from arresting

18   officers but later admitted that he possessed methamphetamine and

19   ammunition, which "suggest[s] that Defendant poses a danger to the

20   community which weighs in favor of detention").

21        Defendant's depraved and duplicitous scheme to intimidate and

22   defraud the very community that he benefited from claiming to help

23   casts his criminal history in an even more troubling light.  Indeed,

24   defendant's history of charges for murder and other gang-related

25   activities, compared with the murder and other violent crimes he is

26   now charged with committing alongside gang members, suggests that

27   defendant did not change his criminal behavior in any way -- he just

28   got better at hiding it.  More recent arrests for child abuse and

being a felon in possession of a firearm also become more ominous in light of the evidence in this case. The Court should pause in considering whether defendant is able or willing to conduct himself without putting others in danger.

That defendant so clearly fled from law enforcement the night before his arrest, only to publicly blame others for his crimes and charges, reinforces his guilt and his incompatibility with pretrial release. Cf. United States v. Hernandez-Miranda, 601 F.2d 1104, 1107 (9th Cir. 1979) (flight immediately after commission of a crime or immediately before trial supports inference of consciousness of guilt).

Defendant's surrender to law enforcement was likewise not to fight the charges and show that he has nothing to hide but was taken with the precise goal of crafting an argument for bail before the Court. However, while defendant may have made the calculated decision -- in consultation with his attorneys -- to return to Los Angeles after his relatively brief flight from his arrest on the complaint, that calculus inevitably changes today, after a 43-count indictment was returned with extremely serious offenses carrying enormous potential penalties. He is now, for the first time in decades, facing the very likely prospect of never leaving prison alive. Indeed, that would be a Guideline sentence on the charges the government is prepared to prove by, among other things, the testimony of witnesses and victims and electronic evidence, including intercepted phone calls and surreptitious recordings. Given the serious nature of the charges, the strength of the evidence, and the defendant's access to vast amounts of resources and criminal support,

his risk of non-appearance is more pronounced today than it has ever
been.

> **D.    Nature and Seriousness of the Danger Posed by Defendant's
> Release**

Defendant is not only a risk of danger to the community but has
acted on his dangerousness time and again.  While this brief
summarizes many of defendant's violent acts, it may be missing others
given defendant's use of others to commit crimes for him and his
proclivity for talking in person or on an encrypted application to
avoid detection.  And still, defendant's varied crimes are still
omnipresent in his recorded communications.

Further, defendant's release would pose a serious risk to
individuals who have assisted the government in this case, as well as
witnesses and victims who have so far refused to cooperate or provide
statements because of what they know.  As defendant made clear in an
intercepted call on January 5, 2023, being "a rat" means you are
"done."  Indeed, trying to intimidate and dissuade anyone from
cooperating with law enforcement or otherwise reporting information
about defendant, before turning himself in, defendant posted an
Instagram video naming his co-defendants and known opponents,
instructing the public not to associate with them, and claiming that
if they did, "they were not black."  This tracks with the means and
methods of the enterprise described in the indictment:  "Threatening
or pressuring victims or witnesses of crimes committed by members or
associates of the Big U Enterprise to avoid interaction with, or to
provide untruthful statements or testimony to, law enforcement
officers."  Defendant's release would pose a serious risk to the
safety of those specific individuals.

1    "[T]hreats of physical harm to cooperating witnesses risk
2    serious danger to the witnesses themselves, as well as to the
3    community more broadly.  To be plain, such conduct fundamentally
4    endangers the integrity of the judicial process." United States v.
5    Comberger, No. 5:21-MJ-05138-MAS-1, 2021 WL 1725516, at *5 (E.D. Ky.
6    Apr. 30, 2021); see also United States v. Prieto, No. 3:19-CR-142-
7    RGJ, 2020 WL 3105414, at *4 (W.D. Ky. June 11, 2020) (upholding
8    detention on danger finding based on defendants' "own threats of
9    violence, including threats to potential witnesses or cooperators").
10   Even non-violent threats to the judicial process, which defendant is
11   also engaged in, may warrant detention.  United States v. LaFontaine,
12   210 F.3d 125, 134-35 (2d Cir. 2000) (explaining that detention may be
13   "even more justified in cases of violations related to the trial
14   process (such as witness tampering) than in cases where the
15   defendant's past criminality was said to support a finding of general
16   dangerousness" and rejecting "contention that her attempts to
17   influence the testimony of" witnesses "does not constitute the type
18   of danger to the community that would support detention"); see, e.g.,
19   United States v. Richardson, No. 2:11-CR-220, 2011 WL 5026456, at *6
20   (S.D. Ohio Oct. 21, 2011) ("[E]ven the non-violent forms of
21   obstruction of justice pose a sufficiently serious danger to the
22   community such that pretrial detention is warranted.").

23        No bail resources could mitigate defendant's danger to the
24   community in light of the severity of his charged offenses and his
25   obstruction during the investigation and following the announcement
26   of charges.  See United States v. Hir, 517 F.3d 1081, 1085, 1094 (9th
27   Cir. 2008) (affirming district court's denial of proposed $600,000
28   secured bail package based on risk defendant posed to the community);

18

see also Rep. No. 225, 98th Congress, 1st Sess. 1983, 1984 U.S.C.A.N. 3182, 3198-99 (n.60) (Congress finding that "a defendant who is a danger to the community remains dangerous even if he has posted a substantial money bond").  Likewise, any proposed release conditions -- including electronic monitoring -- would all suffer from the "critical flaw" in that "they depend on [defendant]'s good faith compliance" in order to be effective.  Hir, 517 F.3d at 1092 (citation omitted).  In particular, "electronic monitoring does not prevent a defendant from committing crimes within the monitoring radius," and "there is no reasonable way to assure that a defendant would not make impermissible stops or detours on his way to places permitted under the restrictions."  Id. at 1092 n.11 (citation omitted); see also Tortora, 922 F.2d at 886 (reversing release order finding that restrictions on communications with any person not approved by counsel, monitoring of phone through pen register, 24-hour house arrest, and other conditions had "an Achilles' heel" because "virtually all of them hinge on the defendant's good faith compliance").  Because defendant's personal commitment to abide by release conditions is the key factor for determining his fitness for bail, see Hir, 517 F.3d at 1092, his serial and flagrant criminality counsels against bail in this case.

     In particular, given defendant's history of engaging in obstructive conduct, no condition on the bond form could prevent and detect such conduct.  For example, in United States v. Ferranti, 66 F.3d 540, 543-44 (2d Cir. 1995), a case in which the defendant was charged with witness tampering, among other crimes, and where obstruction remained an ongoing concern, the circuit court reversed the district court's release of the defendant on bail conditions

19

because the $1 million bond, which was to be secured by properties owned by the defendant and his family, only deterred non-appearance, not danger.  More specifically, the appellate court found that the district court's bail condition intended to address witness tampering -- which was a general prohibition that the defendant was not to commit a crime or intimidate a witness -- "does not at all impede his ability to do so, and requires no more of him than that which the law already demands from [a defendant] and every other citizen."  Id. at 544 (quotation omitted).

Even participation in Pretrial Services' computer monitoring program would be insufficient to ensure that the defendant will cease engaging in unauthorized or inappropriate communications in person, on undisclosed devices, or through third parties.  Indeed, defendant flouted BOP rules for years.  Defendant previously bragged about paying guards and overseeing the entire "drug trade on the yard" when previously serving time.  More recently, as overheard on an intercepted call on November 22, 2022, when defendant told an incarcerated individual that defendant was going to charge someone in federal prison $6,000 to have a phone smuggled to him.  Then, on January 3, 2023, on an intercepted call, defendant told an incarcerated individual that defendant was going to purchase six miniature phones to send to the incarcerated individual so that he could sell them in prison for $1,000 each.  Now in custody himself, defendant has asked his family to contact known victims in this case. If defendant cannot abide by rules in the highly restrictive setting of detention, there is no reason he should be trusted to abide by the Court's conditions in a less restrictive setting.  The risk to

numerous victims and witnesses in this case, as well as the rest of the public, is too great to give defendant that chance.

**V.    CONCLUSION**

If the Court wants to know how defendant will conduct himself on pretrial release, it need look no further than the recordings documenting defendant's conduct and threats throughout this investigation.  With everything to lose, including the immense goodwill he fraudulently procured from the community and his city, defendant still told anyone who dared to ask that he was a killer. And he proved that he was.  Because defendant is both a danger to the community and a risk of non-appearance should the case not go his way, this Court should permanently detain defendant pending trial.[3]

---

[3] If this Court is inclined to grant bail, the government respectfully requests that this Court stay its bail order pending appeal to the Honorable Fernando L. Aenlle-Rocha.